**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

STEPHANY WEBSTER,

                **Plaintiff,**

v.                                          **Case No. 22-cv-239-JFH**

FAIRWAY MANAGEMENT, INC.,
WALNUT PARK MANOR, L.P.,
JES HOLDINGS, LLC,

                **Defendants.**

## OPINION AND ORDER

Before the Court is Defendants' Motion for Summary Judgment. Dkt. No. 55.[1]  The motion has been fully briefed and is ripe for consideration.  For the reasons set forth below, Defendants have demonstrated that they are entitled to summary judgment on all of Plaintiff's claims against them and, as such, Defendants' Motion will be granted.

### FACTUAL AND PROCEDURAL BACKGROUND

The Court begins by noting that Plaintiff's Response in Opposition to the Defendant's Motion for Summary Judgment [Dkt. No. 67] frequently purports to dispute portions of Defendants' statement of undisputed material facts without citing to any evidence in the record contradicting those facts; in such instances, Plaintiff has failed to properly dispute the asserted fact. *See* Fed. R. Civ. P. 56(c)(1); LCvR 56.1; *Roska ex rel. Roska v. Peterson*, 328 F.3d 1230, 1246 n.13 (10th Cir. 2003) (explaining that the district court need not comb through the summary judgment record for evidence supporting a party's arguments).  Moreover, several of Plaintiff's "disputes"

---

[1] Defendants' Motion for Summary Judgment raises arguments on behalf of every Defendant and does not distinguish between any Defendant and the role in the alleged conduct played by the Defendants.  Accordingly, this Court will not distinguish between Defendants in analyzing Defendants' Motion.

of fact are so frivolous as to risk breaching her attorney's professional obligation of candor to this Court. As an example, Plaintiff disputes that the "HOME Investment Partnerships Program" lease addendum that she signed on February 28, 2017 obligated her "to cooperate in the recertification process or else be in breach of her lease agreement." Dkt. No. 67 at 3. In support of this "dispute" Plaintiff cites to nothing other than the lease addendum itself, which provides in the very first body paragraph that: "the Resident agrees to comply with owner request to recertify HOME income eligibility on an annual basis. Failure to cooperate with such requests constitutes a violation of the lease." Dkt. No. 55-29. This kind of meaningless "dispute" gains Plaintiff nothing, misrepresents the record, and wastes the effort of the parties and the Court. This is not the first time that this Court has remonstrated with Plaintiff's counsel regarding the appropriate method of responding to a summary judgment motion. *McVicker v. Muskogee Hous. Auth.*, 2024 U.S. Dist. LEXIS 181690, *1-2 (E.D. Okla. Oct. 4, 2024).

The following material facts are either uncontroverted or construed in the light most favorable to Plaintiff.

## I.    The Parties' Dispute Regarding Income Certification.

Fairway Management, Inc. ("FMI") is a Missouri corporation that operates as a property management firm for over 12,200 affordable apartment homes. Dkt. No. 55 at 7. Walnut Park Manor, L.P. ("WPM") is a Missouri limited partnership that operates Walnut Park Manor, a low-income apartment complex for seniors in Sapulpa, Oklahoma. *Id.* JES Holdings ("JES") is a trade name for Bear Holdings, L.L.C., a Missouri limited liability company; JES is a marketing company and does not provide property management services to Walnut Park Manor. *Id.*

Plaintiff has been a resident of WPM since 2017; she continues to reside there to the present day. Dkt. No. 55 at 17, UMF No. 62; Dkt. No. 67 at 20. On January 24, 2017, Plaintiff executed

a Lease Agreement with WPM, the term of which was to run from January 24, 2017 to December 31, 2017. *Id.* at 8, UMF No. 6; Dkt. No. 67 at 8. In the Lease, Plaintiff agreed to cooperate with WPM regarding requirements it must meet to be eligible for "the low-income housing tax credit program under Section 42 of the Internal Revenue Code." Dkt. No. 55-2 at 1. Further, in a section of the Lease entitled "ANNUAL CERTIFICATION AND ANNUAL RECERTIFICATION," Plaintiff agreed to recertify her income and assets on an annual basis:

**ANNUAL CERTIFICATION AND ANNUAL RECERTIFICATION**. RESIDENT's eligibility to occupy the Premises is based on information that RESIDENT provides to LESSOR regarding RESIDENT's household income and assets before initial entry into the Premises. It is the RESIDENT's responsibility to inform LESSOR if changes to this information should occur. RESIDENT shall notify LESSOR immediately in writing if (i) RESIDENT's household size changes, (ii) RESIDENT's income or assets increases, (iii) RESIDENT become(s) a full-time student, (iv) RESIDENT needs a live-in care attendant, or (v) RESIDENT begins to receive Department of Housing and Urban Development ("HUD") assistance. LESSOR may elect not to renew this Lease if RESIDENT becomes a student and LESSOR determines that RESIDENT's student status would disqualify the Premises under the Program. LESSOR may adjust RESIDENT's rental and/or utility allowance to reflect RESIDENT's status if RESIDENT becomes a HUD-assisted tenant. Occupancy of the Premises by additional household members is subject to the eligibility requirements of the Program. Eligibility must be certified prior to the additional household member taking occupancy.

As a resident in an IRS Section 42 Tax Credit Property, RESIDENT's continued eligibility to occupy the Premises shall require an income and asset certification at least once annually after entry into the Premises. The recertification shall include an interview, completion of applications, verification or certification of income, assets, and other eligibility information, and execution of a new Income Certification Form. RESIDENT has completed and executed an Income Certification Form prior to execution hereof, and shall complete and execute further Income Certification Forms at LESSOR's request at least once annually hereafter. Upon request by LESSOR, RESIDENT shall recertify RESIDENT's household income to LESSOR or any governmental or quasi-governmental agency in a manner satisfactory to LESSOR, and shall complete any and all other certifications and supply further documentation with respect to income and occupancy of the Premises as may be reasonably requested by LESSOR.

Failure to provide accurate and timely income certifications and related documentation will constitute a material breach of this Lease. RESIDENT hereby certifies that the information supplied by RESIDENT to LESSOR that was taken into consideration by LESSOR in determining RESIDENT's qualifications to rent the Premises, and that such information is accurate, complete and true in all respects. RESIDENT further certifies that any and all recertifications as may be required from time to time, shall also be accurate, complete, and true in all respects. RESIDENT further agrees that failure to provide such information, or providing false or misleading information, may result in the termination of RESIDENT's occupancy and eviction from the Premises. RESIDENT agrees that all information supplied by RESIDENT shall be subject to inspection by representatives from MHDC and/or the IRS.

Dkt. No. 55-2 at 2. The Lease further provided that Plaintiff was required to recertify her income by December 1, 2017. *Id.* Plaintiff testified that she understood that she was required to recertify

3

her income and assets on an annual basis by providing information relating to her income and assets; Plaintiff understood that failure to do so would be a material breach of her Lease.  No. 55-3A at 41:12-23.

Plaintiff executed a second Lease agreement with WPM on June 21, 2017 (why is unclear), the term of which ran from July 1, 2017 to June 30, 2018.  Dkt. No. 55-30.  The second Lease contained the same "Annual Certification and Annual Recertification" provision as the first Lease; this second Lease provided that Plaintiff's certification was to be completed by September 1, 2018. Dkt. No. 55-30 at 2.  Plaintiff also executed two lease addenda in 2017, both of which reiterated Plaintiff's obligation to comply with income and asset recertification.  Dkt. No. 55-29; Dkt. No. 55-31.

The state of the record on the lease certification dispute is confused, and neither party has explained the parties' dispute well.  Plaintiff has submitted a "Tenant Income Certification" form completed on April 18, 2018; and a second, more detailed recertification form dated March 25, 2019.  Dkt. No. 67-6.  Plaintiff's Response brief represents that the recertification paperwork is dated February 28, 2018 and April 11, 2018, but this does not comport with her exhibits.  Dkt. No. 67 at 11.  And yet, there are other references in the record to February 2018 recertification paperwork. See Dkt. No. 55-3 at 23.  Defendants have not addressed these forms or explained Plaintiff's noncompliance in detail, but instead assert that Plaintiff "failed to timely complete her recertification paperwork," though the Court notes that the April 18, 2018 and February 2018 paperwork would have been timely.  Dkt. No. 55 at 11.

Defendant sent notices to Plaintiff on September 7, November 14, and November 15, 2018 notifying Plaintiff that her annual certification needed to be completed.  Dkt. Nos. 55-10; 55-11;

55-12.  Defendant sent a Final / Termination Notice to Plaintiff on December 12, 2018, informing Plaintiff that it would begin termination of her lease.  Dkt. No. 55-13.

On August 20, 2019, Defendants sent Plaintiff a Notice to Terminate Residential Apartment Lease Agreement.  *Id.* at 13.  On August 29, 2019, Plaintiff's counsel sent Defendants a letter requesting to meet regarding the lease termination; the letter also informed Defendants that Plaintiff had a disability that may have contributed to the recertification issues and requested as a reasonable accommodation that Plaintiff be permitted to complete recertification after the deadline and that Plaintiff's counsel be permitted to help her with certification.  Dkt. No. 67-1 at 28. Plaintiff obtained a temporary restraining order against WPM, enjoining WPM from evicting Plaintiff on September 23, 2019 after, according to Plaintiff, WPM did not respond to Plaintiff's counsel's request for a meeting.  *Id.* at 67-1 at 21-25; Dkt. No. 55 at 13, UMF No. 35; Dkt. No. 67 at 15.  Plaintiff was not evicted from her unit.  Dkt. No. 55 at 17, UMF No. 62; Dkt. No. 67 at 20.

Plaintiff and WPM met on October 2, 2019 for an informal grievance hearing to discuss Plaintiff's income recertification; at that time Plaintiff requested a reasonable accommodation of being permitted assistance with her recertification.  Dkt. No. 55-5; Dkt. No. 55-22.  The meeting concluded (as documented by Defendant) with Defendant asking Plaintiff to submit a reasonable accommodation request form within two weeks of the meeting.  Dkt. No. 55-22 at 3.

The difficulty between the parties regarding Plaintiff's income recertification stemmed, apparently, from miscommunication between the parties regarding whether Plaintiff received $1,100 in monthly alimony payments; Plaintiff declined to verify recertification documents that attributed this income to her because Plaintiff was not actually receiving this reported income. Dkt. No. 55 at 12; Dkt. No. 67-1 at 4.

Eventually, on December 31, 2020, the recertification issues between the parties were resolved; as part of this process, Plaintiff executed Residential Lease Agreements for the expired terms of 2019 and 2020, and a further Lease agreement for the coming year.   Dkt. Nos. 55 at 14; 55-37; 55-39; 59-40.

**II.     Requests for Reasonable Accommodations.**

On February 13, 2017, Plaintiff requested that Defendants remove the washer and dryer so that she could use her own, and she also requested an ADA toilet to accommodate Plaintiff's medical conditions.  Dkt. No. 55 at 9-10; 55-6; 55-7.  These requests were granted.  Dkt. No. 55-8; Dkt. No. 55 at 10; Dkt. No. 67 at 10.   Plaintiff also requested that her refrigerator be removed as an accommodation.  Dkt. No. 55-6.  WPM denied this request initially, on the grounds that compliance would cause an undue financial burden, apparently understanding that Plaintiff was requesting that WPM provide a larger refrigerator, but Plaintiff contends that she merely asked that she be permitted to use her own refrigerator.  Dkt. No. 55-8; Dkt. No. 67 at 10.  On July 20, 2017, WPM sent correspondence to Plaintiff informing her that she could install her own refrigerator in her apartment.  Dkt. No. 55-9.

As noted above, Plaintiff also represents her August 19, 2019 correspondence with Defendants regarding her recertification as a request for reasonable accommodations. Dkt. No. 67-1 at 28.

**III.    Dispute regarding utility payments, other lease violations.**

In 2018 to 2019, Defendants sent Plaintiff lease violation notices relating to Plaintiff not allowing Defendants to enter her apartment to read her water meter; Defendant sent Notices of Violation for such conduct on August 13, 2018, September 5, 2018, December 28, 2018, January 28, 2019, and March 8, 2019.  Dkt. No. 55-5; Dkt. No. 55-18.  Plaintiff, without citation, "disputes"

that her lease obligated her to permit inspection of her water meter. Dkt. No. 67 at 14. Without

citation, this dispute is specious and will be ignored. Plaintiff also maintains that she had requested

that Defendants not enter her apartment as a "reasonable accommodation" due to Plaintiff having

had an eye surgery in May 2019 (it is unclear why this surgery would have affected her conduct

some 9 months prior to the surgery). Dkt. No. 67 at 14; 67-1 at 3. Plaintiff has cited no evidence

showing that she made such a request for accommodation.

During Plaintiff's tenancy, issues also arose regarding payment of Plaintiff's utilities. The

record on the issue of Plaintiff's alleged rent liability is also poorly developed by Defendants.

Defendant relates that WPM filed a small claims action against Plaintiff on March 13, 2020 for

unpaid rent in an amount of $1,176, but the action was dismissed after Defendant did not appear

for the hearing. Dkt. No. 55-34, 55-35. The Court has also been presented with a Notice of

Delinquent Rent Warning dated August 31, 2021, a Notice of Violation dated May 6, 2022, a

"Balance Due Notification" dated May 6, 2022 (showing an amount due of $29. 94), and another

"Balance Due Notification" dated May 16, 2022 (showing an amount due of $54.94). Dkt. No.

55-23, 55-25, 55-26. This rent dispute led to WPM sending Plaintiff a further Notice to Terminate

Residential Apartment Lease on May 16, 2022. Dkt. No. 55-26. The record is entirely unclear as

to what Plaintiff paid in rent over these time periods, and, so far as the Court can tell, the record is

even uncertain regarding what Defendants allege Plaintiff has not paid.

In addition to Defendants' meager documentation, Plaintiff has attached photos of what she

alleges are rent checks that were, Plaintiff avers, uncashed by Defendant [Dkt. No. 67-1 at 69 to

83]. Defendant has explained that Plaintiff's rent checks from October 2019 to May 2020 were

not cashed because her Second Lease Agreement had been terminated effective September 19,

2019 and Plaintiff had not completed the recertification process and signed a new residential lease

agreement. Dkt. No. 84 at 5. Defendants further explained that they were concerned that cashing Plaintiff's rent checks after the Second Lease Agreement was terminated could have been asserted as a waiver of Plaintiff's breach of the Second Lease Agreement and Defendants' right to evict Plaintiff. *Id*. at 6. Defendants state that the decision not to cash Plaintiff's rent checks during the time period in which the Second Lease Agreement was terminated was not motivated by animus, but was done solely to protect Defendants' desire to preserve their rights. *Id*. In response, and without citing to anything in the record, Plaintiff disputes that her lease terminated on September 19, 2019. Dkt. No. 85 at 2.

## IV.    Institution of suit and Plaintiff's claims.

Following WPM's May 16, 2022 Notice to Terminate Residential Apartment Lease, Plaintiff initiated this suit on June 2, 2022. Dkt. No. 2.

### A.    Plaintiff's federal claims.

Plaintiff brings sex discrimination claims under the Fair Housing Act ("FHA"), 42 U.S.C. § 3604(a), (b), and (c) and under the Violence Against Women Act ("VAWA"), and 34 U.S.C. § 12491. Dkt. No. 2. Plaintiff's claim under 42 U.S.C. § 3604(a) alleges that Defendants "made and are making housing unavailable" to Plaintiff on the basis of her sex. Dkt. No. 2 at 15-16. Plaintiff similarly alleges that Defendants have made housing unavailable to her because she is a victim of domestic violence in violation of VAWA. *Id*. at 19. Plaintiff further alleges that Defendants have discriminated against her on the basis of her sex because they have "condition[ed] her housing upon direct contact with her abuser." *Id.* at 16. Under 42 U.S.C. § 3604(c) Plaintiff alleges that Defendants have made discriminatory statements to Plaintiff. *Id.* at 16.

Plaintiff also alleges several disability-based housing discrimination claims. Plaintiff alleges that Defendants have made housing unavailable to Plaintiff on the basis of her disability in

violation of 42 U.S.C. § 3604 (f)(1)(C). *Id.* Plaintiff further alleges that Defendants have refused to grant Plaintiff's requested reasonable accommodations, which were necessary to afford Plaintiff equal housing, in violation of 42 U.S.C. § 3604(f)(3)(B). *Id.* at 17. Lastly, Plaintiff alleges that Defendants have taken retaliatory actions against her for asserting her rights under the Fair Housing Act in violation of 42 U.S.C. § 3617. *Id.* Plaintiff brings claims under the Rehabilitation Act, 29 U.S.C. §794, that are identical to Plaintiff's disability based FHA theories. *Id.* at 18.

**B.  Plaintiff's state law claims.**

Plaintiff forwards several state law theories of recovery as well. Plaintiff has sued Defendant for breach of the lease, malicious prosecution, fraud, and for violation of the Oklahoma Consumer Protection Act. Dkt. No. 2 at 19-25.

## DISCUSSION

**I.  Applicable standards of review.**

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Jones v. Kodak Med. Assistance Plan*, 169 F.3d 1287, 1291 (10th Cir. 1999); Fed. R. Civ. P. 56(a). "A dispute is genuine when the evidence is such that a reasonable jury could return a verdict for the nonmoving party, and a fact is material when it might affect the outcome of the suit under the governing substantive law." *Bird v. W. Valley City*, 832 F.3d 1188, 1199 (10th Cir. 2016). Only material factual disputes preclude the entry of summary judgment. *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000).

The movant bears the initial burden to demonstrate the absence of a genuine issue of material fact and its entitlement to judgment as a matter of law. *Adler v. Wal-Mart Stores, Inc.*,

144 F.3d 664, 670-71 (10th Cir. 1998). If the movant carries this initial burden, "the burden shifts to the nonmovant to go beyond the pleadings and set forth specific facts that would be admissible in evidence in the event of a trial from which a rational trier of fact could find for the nonmovant." *Id.* at 671. If the nonmovant demonstrates a genuine dispute as to material facts, the Court views the facts in the light most favorable to him. *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009). However, a failure of proof "concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

**II.    Defendants are entitled to summary judgment regarding Plaintiff's sex and domestic violence discrimination claims.**

Plaintiff has alleged sex discrimination claims in violation of the Fair Housing Act under 42 U.S.C. § 3604(a), § 3604(b), and § 3604(c). Plaintiff forwards the same facts as a basis for recovery under VAWA.

**A.    Plaintiff's claim under 42 U.S.C. § 3604(a).**

Title 42, U.S.C. § 3604(a) reads as follows:

> It shall be unlawful…To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin.

Plaintiff alleges that Defendants "have made and are making" housing unavailable to Plaintiff on the basis of her sex. Dkt. No. 2 at 15 to 16.

Defendants argue that, because Plaintiff has never been evicted from her rental unit, Defendants are entitled to summary judgment on Plaintiff's claim under § 3604(a). Dkt. No. 55 at 17, 18-19. Plaintiff does not dispute that she "has lived at Walnut Park Manor continuously since January 24, 2017" and "has never been evicted from Walnut Park Manor." Dkt. No. 67 at 20.

Section 3604 requires that, to be liable, Defendants must "make unavailable … a dwelling" to Plaintiff; a plain reading of this language supports Defendants' argument that, absent eviction or refusal to rent, Plaintiff cannot bring a claim under this section of the statute. *Sailboat Bend Sober Living, LLC v. City of Fort Lauderadale*, 46 F.4th 1268, 1276 (11th Cir. 2022). Because Plaintiff continuously resided at Walnut Park Manor during every instance of alleged discrimination and continues to do so, Defendants are entitled to summary judgment on Plaintiff's claim that they have made housing unavailable to her.

**B.    Plaintiff's claim under 42 U.S.C. § 3604(b).**

Title 42, U.S.C. § 3604(b) makes it unlawful to discriminate "in the terms, conditions, or privileges of sale or rental of a dwelling" on the basis of race, color, religion, sex, familial status, or national origin. Plaintiff alleges that Defendants have discriminated against her because of her sex "by conditioning her housing upon direct contact with her abuser." Dkt. No. 2 at 16.

To establish a prima facie case of disparate treatment under this section, Plaintiff must demonstrate that "(1) [she] is a member of a statutorily protected class; and (2) [she] was not offered the same terms, conditions or privileges of rental of a dwelling or was not provided the same services or facilities in connection therewith made available to others giving rise to a reasonable inference of prohibited discrimination." *Delkhah v. Moore*, 2006 U.S. Dist. LEXIS 31087, *17 (D. Kans. May 15, 2006); see also *Blackburn v. Webb*, 2023 U.S. Dist. LEXIS 161166, *4 (W.D. Okla. Sep. 12, 2023). Plaintiff must show that she was "similarly situated" to other renters and was treated differently on account of her sex. *Blackburn*, 2023 U.S. Dist. LEXIS 161166, *4-5 (quoting *Caddy v. J.P. Morgan Chase Bank*, 237 F. App'x 343, 347-48 (10th Cir. 2007) (unpublished)).

11

Defendants argue that Plaintiff's claim fails because she still resides at Walnut Park Manor, has never been evicted therefrom, and has never been required to contact "her abuser," and, as such, Plaintiff's tenancy has never been "conditioned upon direct contact with her abuser." Dkt. No. 55 at 14-15; Dkt. No. 2 at 16. Plaintiff does not dispute that she has never been evicted and has never been required to contact her abusive ex-husband. Any claim that Defendants have discriminated against Plaintiff in the terms of her rental by "conditioning" her tenancy upon "contact with her abuser" fails.

In Plaintiff's Response to Defendants' Motion, she does not claim that she was made to contact her abusive ex-husband, nor does she claim that Defendants ever contacted her former abuser; rather, Plaintiff states that an agent of Defendants "threatened" to contact her ex-husband to obtain additional proof that Plaintiff was not receiving alimony from her ex-husband. Dkt. No. 67 at 21; Dkt. No. 2 at 8. Taking these statements as true, the singular "threat" to contact Plaintiff's abusive ex-husband to obtain more information regarding Plaintiff's income does not constitute a different "term[], condition[], or privilege[]" of Plaintiff's lease. 42 U.S.C. § 3604(b). A plain reading of the phrase "terms, conditions, or privileges of sale or rental of a dwelling" refers to the contractual terms of sale or, in this case, a lease; Plaintiff does not allege that Defendants have discriminated against her in the terms of her lease.

Further, this Court finds that a discrete instance of differential treatment based upon an individual's status as a domestic abuse victim does not *per se* constitute discrimination on the basis of sex. This Court has previously had occasion to examine this precise question, and it concluded:

> a sex discrimination claim based upon claimant's status as a domestic violence victim may lie only if a plaintiff can demonstrate: (1) the defendant has adopted a policy regarding victims of domestic violence that has had a disparate impact upon women or (2) the defendant has intentionally discriminated against the plaintiff/domestic-violence-victim *because* she is a woman. In the context of a disparate impact claim, status as a domestic violence victim may be an adequate

proxy for sex because a policy unfairly targeting domestic violence victims will largely affect women. But, when considering a disparate treatment claim, status as a domestic violence victim is not a sufficient proxy for sex for the simple reason that not all domestic violence victims are women; plaintiff must still demonstrate that she was intentionally discriminated against based upon her *sex*. *Bostock*, 590 U.S. at 657-658. As the Eighth Circuit has observed, though in the context of an equal protection claim, "discrimination against victims of domestic violence is not *ipso facto* sex discrimination." *Dornheim v. Sholes*, 430 F.3d 919, 925 (8th Cir. 2005).

*McVicker v. Muskogee Hous. Auth.*, 2024 U.S. Dist. LEXIS 181690, *22-23 (N.D. Okla. Oct. 4, 2024).

As such, even if this Court were inclined to find that the threat to contact Plaintiff's abusive ex-husband constituted discrimination in the "terms, conditions, or privileges" of Plaintiff's lease, the record must still demonstrate that those actions were taken against Plaintiff because she was a woman. The Court has seen no such evidence in the summary judgment record. Instead, the complained of threat was made because Defendants needed an accurate accounting of Plaintiff's income in order to recertify Plaintiff under the lease. There is no suggestion that the recertification requirement was not applied equally to all residents or that Plaintiff was uniquely targeted for recertification because of her sex. Defendants are entitled to summary judgment regarding Plaintiff's claim under 42 U.S.C. § 3604(b).

**C. Plaintiff's claims under VAWA fail.**

Plaintiff alleges that the above-discussed facts also demonstrate a compensable violation of VAWA. Dkt. No. 2 at 19. However, it is well established that VAWA's private right of action has been struck down by the Supreme Court. *United States v. Morrison*, 529 U.S. 598, 627 (2000); *see also*, *White v. Parks*, 2024 U.S. Dist. LEXIS 78583, *19 (Kan. Apr. 30, 2024); *Merrill v. Ito*, 2023 U.S. Dist. LEXIS 187680, *1 (Utah Oct. 18, 2023); *Phillips v. James*, 2023 U.S. Dist. LEXIS 20146, *1 (E.D. Okla. Jan. 18, 2023).

### D.    Plaintiff's claim under 42 U.S.C. § 3604(c).

The Fair Housing Act also makes it unlawful: "to make…any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, handicap, familial status, or national origin, or an intention to make any such preference, limitation, or discrimination."  42 U.S.C. § 3604(c).  Defendants argue that Plaintiff has not identified any statement of Defendants that would violate this provision.  Dkt. No. 55 at 20-21.  Plaintiff argues in response that "Defendants' property manager threatened to contact the Plaintiff's abuser in the housing recertification process" and "wrote a lease violation because the Plaintiff told her that she was going to call the police due to Andersen's threat to contact her abuser."  Dkt. No. 67 at 23.

This claim fails for the same reason that Plaintiff's claim under § 3604(b) fails; even if this Court were to construe the property manager's statement as an instance of discrimination against Plaintiff because Plaintiff is a domestic violence victim, that does not mean that the statement would constitute sex discrimination.  Plaintiff must still show that the property manager's discriminatory statement was directed toward Plaintiff based upon her sex, and no such evidence appears in the record.  Summary judgment is granted on Plaintiff's claim under 42 U.S.C. § 3604(c).

### III.    Defendants are entitled to summary judgment on Plaintiff's disability discrimination claims.

Plaintiff alleges that Defendants have violated provisions of the FHA and Rehabilitation Act prohibiting housing discrimination on the basis of disability.  Dkt. No. 2 at 16 to 17.  Plaintiff also alleges that Defendants have retaliated against Plaintiff for exercising her rights under the FHA and Rehabilitation Act [Dkt. No. 2 at 17-18]; Plaintiff's retaliation claims will be addressed separately in Section IV below.

**A.    Plaintiff's claim under 42 U.S.C. § 3604(f)(1)(A).**

Title 42 U.S.C. § 3604(f)(1)(A) makes it unlawful: "To discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of that buyer or renter." Plaintiff alleges: "Defendants have engaged in an unlawful discriminatory housing practice by refusing to rent, to negotiate for rental, and otherwise making housing unavailable to Plaintiff because of her handicap." Dkt. No. 2 at 16. As noted above, Defendants have at no time made housing unavailable to Plaintiff; Plaintiff does not dispute that Plaintiff has resided at Walnut Park Manor continuously since January 24, 2017 and has never been evicted. See § II(A), *supra*. Defendants are entitled to summary judgment on this claim.

**B.    Defendants are entitled to summary judgment on Plaintiff's reasonable accommodation claims under 42 U.S.C. §§ 3604(f)(2)(a), 3604(f)(3)(b), and 29 U.S.C. § 794.**

Plaintiff also alleges that Defendants have "subject[ed] the Plaintiff to different terms, conditions, and privileges of rental because she is a person with a disability." Dkt. No. 2 at 16.[2] Specifically, Plaintiff alleges that Defendants have discriminated against her by refusing to provide, or delaying, her reasonable accommodations that were necessary to afford her an equal opportunity to use and enjoy her dwelling. Dkt. No. 2 at 16-18; 42 U.S.C. § 3604(f)(3)(B).

**1.    Applicable legal standards.**

To state a prima facie case for disability discrimination under the Fair Housing Act, Plaintiff must demonstrate that: "(1) [s]he suffers from a handicap as defined by the FHAA ; (2) the defendant knew or reasonably should have known of the plaintiff's handicap [or disability]; (3) accommodation of the handicap [or disability] 'may be necessary' to afford plaintiff an equal

---

[2] Plaintiff's Complaint errantly cites to 42 U.S.C. § 3604(f)(1)(C) as grounds for this claim; the appropriate statutory citation is 42 U.S.C. § 3604(f)(2)(a).

opportunity to use and enjoy the dwelling; and (4) defendants refused to make such accommodation." *Logan v. Matveevskii*, 57 Supp. 3d 234, 256 (S.D.N.Y. Sep. 29, 2014); see also *Dubois v. Ass'n of Apartment Owners of 2987 Kalakaua*, 453 F.3d 1175, 1179 (9th Cir. 2005); *Overlook Mut. Homes, Inc. v. Spencer*, 415 F. App'x 617, 621 (6th Cir. 2011). Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, similarly prohibits discrimination on the basis of disability in federally funded programs or activities including, as relevant here, housing organizations. Disability discrimination claims under the FHA and the Rehabilitation Act may be analyzed together as both statutes "offer the same guarantee that a covered entity, such as a public housing authority, must provide reasonable accommodations in order to make the entity's benefits and programs accessible to people with disabilities…." *Logan*, 57 F. Supp. 3d at 352; *see also*, *Roe v. Hous. Auth. of the City of Boulder*, 909 F. Supp. 814, 821 (D. Colo. 1995).

A refusal to make an accommodation may be actual or constructive, as delay of an accommodation may have "the same effect as an outright denial" in some circumstances. *Groome Res. Ltd. L.L.C. v. Parish of Jefferson*, 234 F.3d 192, 199 (5th Cir. 2000). In evaluating whether delay in granting an accommodation rises to the level of a constructive denial, courts have considered: the length of the delay; the cause of the delay; whether delay is attributable to bad faith; any legal uncertainty regarding the request for accommodation; and whether the delay deprived Plaintiff of the benefit of the accommodation. *See*, *Overlook Mut. Homes Inc.*, 415 F. App'x 617, 622 (Court considered length of delay, uncertain state of the law, and fact that plaintiff was never removed from dwelling); see also *Logan*, 57 F. Supp. 3d at 257-258 (considering reason for delay and presence or absence of bad faith in delay). In the analogous context of disability discrimination in employment, the Tenth Circuit has considered: "the length of the delay, the reasons for the delay, whether the employer has offered any alternative accommodations while

evaluating a particular request, and whether the employer has acted in good faith." *Selenke v. Med. Imaging of Colo.*, 248 F.3d 1249, 1262-63 (10th Cir. 2001). Ultimately, the FHA and Rehabilitation Act prohibit discrimination *because of* an individual's handicap, so the record must demonstrate that animus toward Plaintiff because of her disability was a cause of the delay; the above factors are only useful insofar as they may demonstrate this unlawful motive. *Taylor v. Hous. Auth. of New Haven*, 267 F.R.D. 36, 70 (D. Conn. Mar. 29, 2010); *Manessis v. N.Y. City Dep't of Transp.,* No. 02 Civ. 359(SAS), 2003 WL 289969, *17 (S.D.N.Y. Feb.10, 2003).

Defendants have identified several requests for accommodation made by Plaintiff: (1) a request on February 13, 2017 that Defendants remove the washer and dryer from her unit; (2) a request on February 13, 2017 that Defendants remove the refrigerator from her unit [Dkt. No. 55-6]; (3) a request on February 14, 2017 for an ADA compliant toilet; (4) a request in September 2018 that, following her eye surgery, Defendants not enter her apartment; and (5) a request on August 29, 2019 that Defendants permit Plaintiff to complete her income recertification out of time and with the help of her attorney [Dkt. No. 67-1 at 28].[3] Plaintiff does not genuinely dispute that these requested accommodations were granted by Defendants but instead argues that Defendants unreasonably delayed granting Plaintiff her request for accommodations. Dkt. No. 67 at 17-19.

Having considered Plaintiff's reasonable accommodation claims, the Court finds that Defendants are entitled to summary judgment on all such claims, as explained in further detail below.

---

[3] The Court notes that, of the five requests listed, only the fifth request actually appears in Plaintiff's Complaint. Dkt. No. 2. However, because Defendants have raised these other requests in their Motion for Summary Judgment of their own accord, the Court will treat these other accommodation requests as properly before the Court.

**2.      Plaintiff's request for ADA toilet and for removal of washer and dryer.**

On February 13, 2017, Plaintiff submitted a reasonable accommodation request form, seeking the removal of her washer and dryer so that she could install her own, and on February 14, 2017, Plaintiff submitted a further form, requesting that Defendants install an ADA toilet.  Dkt. No. 55-6; Dkt. No. 55-7.  Defendants approved Plaintiff's request for installation of an ADA toilet and to remove her washer and dryer approximately one month after receiving Plaintiff's written request.   Dkt. Nos. 55-6, 55-7, 55-8.  A month is a reasonable time period for Defendants to process Plaintiff's request for accommodations; the Court is unaware of any case holding that a month is an unreasonable time period to process such a request and the Plaintiff has pointed to no such case law.  Further, Plaintiff has pointed to no facts tending to show bad faith or that the delay was attributable to animus against Plaintiff on account of her disability.   Common experience dictates that such a modest delay is to be expected in any bureaucratic system; it does not suggest ill intent.

Plaintiff claims that she made an oral request for removal of her washer and dryer 4 weeks prior to her written request.  Dkt. No. 67 at 17-18; Dkt. No. 55-6.  The Court does not have sufficient information regarding that oral request to determine that it should actually qualify as a request for accommodation – Plaintiff does not state to whom she made the request, how she made the request, whether she informed them of her disability and how it related to her request, etc.  However, even assuming that Plaintiff's oral request was sufficient, the Court finds that a two-month delay in responding to Plaintiff's request to remove her washer and dryer would not be unreasonable, since, as noted above, Plaintiff has pointed to no fact tending to suggest that this delay is attributable to discriminatory animus.

**3.      Plaintiff's request that Defendants remove her refrigerator.**

Plaintiff sent a "Reasonable Accommodation Request" form to Defendants on February 13, 2017, in which Plaintiff asked Defendants to "Remove the fridge as well…I need to use a bigger fridge because of fresh food and vitamin needs due to a health situation with my liver. Cannot drive into metro area everyday to specialty stores." Dkt. No. 55-6. Defendants responded on March 16, 2017, writing "we regret that we are unable to grant your request for a larger refrigerator because it places a financial burden on Walnut Park Manor." Dkt. No. 55-8. Defendants' denial was apparently the result of a misunderstanding, as Plaintiff contends that she was asking to have her own refrigerator installed, and so was simply asking Defendant to remove the refrigerator in her unit, not provide a larger refrigerator. Dkt. No. 67 at 10. On July 20, 2017, Defendants sent Plaintiff correspondence approving Plaintiff's request for removal of her refrigerator. Dkt. No. 55-9. The Court is given no information regarding communication between Plaintiff and Defendants regarding this issue between the initial rejection letter on March 16, 2017 and the later approval on July 20, 2017.

Plaintiff argues that, "[t]he Defendants delayed approval for five months for the refrigerator. The delay … was unreasonable since the Defendants' form provides for a 10–15-day response period." Dkt. No. 67 at 25. Plaintiff's argument is unavailing; the fact that Defendants' form provides for a 10 to 15 day response time is of little relevance to the central question of whether Defendants' delay was indicative of discriminatory animus and amounted to constructive denial.

The longer period of delay here is notable; it took Defendants five months to approve Plaintiff's request that her refrigerator be removed. However, this delay seems largely attributable to mutual miscommunication between the parties. Defendants (understandably given the wording of Plaintiff's request) initially understood Plaintiff to be asking for the installation of a larger

refrigerator.  Defendants reasonably denied that initial request on the basis that it would place an undue financial burden; the initial denial was particularly reasonable, given that Plaintiff did not clearly set forth her disabilities and how the larger refrigerator would be necessary or relate to her disability.  Nothing in the summary judgment record indicates that the delay in removing Plaintiff's refrigerator was attributable to discriminatory animus, as opposed to innocent misunderstanding and routine delay.

### 4.    Plaintiff's request for extension of recertification deadline.

Defendants sent a Notice to Terminate Residential Apartment Lease Agreement to Plaintiff relating to the recertification issue on August 20, 2019; the notice stated that Plaintiff's lease would terminate on September 19, 2019.  Dkt. No. 55-21.  On August 29, 2019, Plaintiff's counsel sent correspondence to Defendant, which read in part:

> Ms. Webster is also a person with a disability, as defined under the federal and State fair housing laws. I believe that the effects of her disability may be a contributing factor to the situation that has resulted in your decision to not renew her tenancy. The Fair Housing Act, and Oklahoma Discrimination in Housing Act permits me to make a request for a reasonable accommodation, on her behalf, that you grant an exception to her to your recertification policy, that you rescind your decision to not renew her tenancy, and that if it is found that she in fact has not recertified, that you give her the opportunity, with my assistance, to recertify to retain her tenancy at the complex.

Dkt. No. 67-1 at 28.

Plaintiff filed a lawsuit against WPM on September 23, 2019, and obtained a Temporary Restraining Order preventing WPM from evicting Plaintiff.  Dkt. No. 55 at 13.  It is unclear if Defendants were ever served in this lawsuit or served with the restraining order.  *Id.*  Defendants met with Plaintiff and her counsel on October 2, 2019 to discuss Plaintiff's income recertification and/or her accommodation request.  Dkt. No. 55-22.  After the meeting, Defendants requested that Plaintiff fill out a separate internal reasonable accommodation request form, which Plaintiff never

did.  Dkt. No. 55-22; Dkt. No. 67 at 16.  Plaintiff was never evicted from her unit, she was permitted further time to complete recertification (recertification would not be completed until December 2020), and Plaintiff's counsel was permitted to help her.  Dkt. No. 67 at 20, 25.

Though the record on the parties' dispute regarding Plaintiff's income recertification efforts is both lengthy and confused, it appears that Defendants provided the reasonable accommodations to Plaintiff that she requested: Plaintiff was permitted to recertify her income well out of time, and she did so with the help of Plaintiff's counsel.

In opposing summary judgment, Plaintiff writes:

Rather than granting her access to the recertification process, the Defendants made the Plaintiff wait four additional weeks. Then, the Defendants denied the Plaintiff's disability and created a form to erect additional barriers to her accessing the requested accommodation. The Defendants' written statements about the Plaintiff's disabilities violate the *FHA*. The Defendants refused to grant the Plaintiff's request claiming that she did not provide evidence of a cognitive impairment that would prevent her from timely recertifying. She was not allowed to recertify until December 31, 2020.

Dkt. No. 67 at 25.  None of this is persuasive, or even particularly relevant to the issues at hand. Plaintiff's declaration that the Defendants' reasonable accommodation request form violated the Fair Housing Act is unsupported by legal argument or authority.  Plaintiff then states that Defendants "refused to grant" Plaintiff's request, but the Court has found no evidence of such a refusal; instead, the record shows that Defendants, despite having questions regarding Plaintiff's request and how it related to her disabilities, nevertheless granted Plaintiff's request for more time to recertify.  Plaintiff argues that Plaintiff "was not allowed to recertify until December 31, 2020." No evidence in the record suggests that Defendants excluded Plaintiff from the recertification process, nor would Defendants have motive to do so – recertification benefits Defendants and impacts their eligibility to participate in the low-income housing tax credit program.

The delay in recertification was lengthy, but the delay was to Defendant's detriment more than it was to Plaintiff, who was permitted to remain in her unit during the multiple years of delay. The record demonstrates that this delay was due to the failure of both parties to effectively communicate with one another. No evidence in the summary judgment record tends to show that Defendants delayed recertification or delayed granting Plaintiff's August 2019 reasonable accommodation request due to discriminatory animus or bad faith. Defendants are entitled to summary judgment on this claim.

### 5. Plaintiff's request that Defendants not enter her apartment unit.

In her Response to Defendants' Motion for Summary Judgment, Plaintiff writes that she "requested that the Defendants not enter her apartment" after she had surgery "to ameliorate the effects of her visual impairments." Dkt. No. 67 at 25. Plaintiff further states that "Defendants denied the requests and issued lease violations to the Plaintiff for refusing to allow entry." *Id*. These allegations appear nowhere in Plaintiff's Complaint and, unlike the prior requests discussed in §§ III(B)(iii) – (iv), Defendant did not raise this request for accommodation in its Motion for Summary Judgment. Given that these facts and this particular theory of recovery have been raised by Plaintiff for the first time in her Response to Defendant's Motion for Summary Judgment, it is not properly before the Court. This Court will not permit Plaintiff to constructively amend the allegations in her Complaint in response to Defendant's Motion for Summary Judgment; allowing such tactics would undermine the purpose of the Complaint and of the entire summary judgment procedure. *See*, *Depatco Inc. v. Ground Eng'g Consultants, Inc*., 2018 U.S. Dist. LEXIS 234188, *25 (D. Wyo. Dec. 3, 2018) (collecting cases).

**IV.    Defendants are entitled to summary judgment on Plaintiff's claim for retaliation under § 3617 of the FHA and the Rehabilitation Act.**

Plaintiff contends that she asserted her rights under the FHA by "obtain[ing] a restraining order after the Defendants ignored her request for accommodation."  Dkt. No. 67 at 19-20.  In response, Plaintiff claims, Defendants took the several retaliatory actions against her: Defendants refused to cash her timely tendered rent checks from October 2019 through May 2020 and sued to evict her for rent; withheld recertification for 2020 and 2021 until December 31, 2020 and forced Plaintiff to do all of the recertification documents in one day; sued Plaintiff for $949 in rent that she did not owe; and attempted to terminate Plaintiff's tenancy due to her failure to pay her water bills which Plaintiff claims she did not owe.  Plaintiff also argues that she exercised her rights under the FHA by "contact[ing] the police after Defendants' property manager threatened to contact her abuser" and Defendant, in retaliation, issued a lease violation.  Dkt. No. 67 at 19.  In support of her Rehabilitation Act retaliation claims, Plaintiff points to the same factual contentions. Dkt. No. 2 at 18; Dkt. No. 67 at 28-29.

The FHA prohibits retaliation against individuals on the basis of their exercise of their rights under the FHA:

> It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 803, 804, 805, or 806 [42 U.S.C. § 3603, 3604, 3605, or 3606].

42 U.S.C. § 3617.  The Tenth Circuit has identified the elements of a § 3617 retaliation claim as follows: "(1) she is a protected individual under the FHA, (2) she was engaged in the exercise or enjoyment of her fair housing rights, (3) the defendants coerced, threatened, intimidated, or interfered with the plaintiff on account of her protected activity under the FHA, and (4) the defendants were motivated by an intent to discriminate." *Hatfield v. Cottages on 78th Cmty. Ass'n*,

2023 U.S. App. LEXIS 10527, *14, 2023 WL 3163256 (10th Cir. 2023) (quoting *Bloch v. Frischholz*, 587 F.3d 771, 783 (7th Cir. 2009)).

Section 504 of the Rehabilitation Act does not expressly prohibit retaliation, but the statute has also been interpreted as prohibiting retaliation for protected conduct. *Jarvis v. Potter*, 500 F.3d 1113 (10th Cir. 2007). The elements of a retaliation claim under the Rehabilitation Act have been identified by the Tenth Circuit as follows: "(1) that [plaintiff] engaged in protected activity; (2) that [plaintiff] suffered a materially adverse action … either after or contemporaneous with her protected activity; and (3) a causal connection between the protected activity and the adverse action." *Reinhardt v. Albuquerque Pub. Sch. Bd. of Educ.*, 595 F.3d 1126, 1131 (10th Cir. 2010). Given that Plaintiff forwards the same factual contentions to support both of her retaliation claims and given the similarity in the elements of both claims, consideration of the claims together is appropriate.

To prove a claim of intentional discrimination under either the FHA or the Rehabilitation Act, a plaintiff may offer either direct evidence of the defendant's discriminatory intent, or she may point to circumstantial evidence of discriminatory intent, thereby "invok[ing] the familiar *McDonnell Douglas* burden shifting scheme originally spawned in the Title VII arena but long since equally entrenched in the FHA, ADA, and RA contexts." *Cinnamon Hills Youth Crisis Ctr., Inc. v. St. George City*, 685 F.3d 917, 919 (10th Cir. 2012); *see also Reinhardt*, 595 F.3d at 1131 (Noting, in the context of a Rehabilitation Act retaliation claim, that plaintiff "may rely upon the burden-shifting framework of *McDonnell Douglas*"). Plaintiff bears the burden of putting forth a *prima facie* case of discrimination, which must include evidence suggesting that the defendant took the complained of action because of plaintiff's disability. *Cinnamon Hills*, 685 F.3d at 920.

24

Having examined Plaintiff's claims and Defendants' arguments under this rubric, the Court concludes that Defendants have shown entitlement to summary judgment on all of Plaintiff's theories of recovery for retaliation.

**A.    Plaintiff's claim that Defendants ceased accepting her rent checks and attempted to evict her in retaliation for obtaining a Temporary Restraining Order fails.**

Plaintiff contends that, after she filed a lawsuit on September 23, 2019 and obtained a Temporary Restraining Order preventing Defendants from evicting her, Defendants refused to accept her rent checks and then used the accrued rent as an excuse to move to evict her. Dkt. No. 67 at 26.

Defendants do not dispute that Plaintiff is an individual with a disability and, as such, is a "protected individual under the FHA" satisfying the first element of her FHA retaliation claim. *Hatfield*, 2023 U.S. App. LEXIS 10527, *14. Plaintiff's Ex Parte Application for an (sic) Temporary Restraining Order and Temporary Injunction is based upon Plaintiff's disability, expressly invokes the disability provisions of the FHA, and represents that Defendants had ignored a reasonable accommodation requestion of Plaintiff's regarding recertification. Dkt. No. 55-33. As such, in filing the lawsuit, Plaintiff "exercised or enjoyed … any right granted or protected" by the FHA, and the filing of the Application is a protected activity as contemplated by the statute. 42 U.S.C. § 3617. For these same reasons, the Court finds that the filing of the September 2019 lawsuit was also a "protected activity" under the Rehabilitation Act.

Plaintiff states that after she obtained the Temporary Restraining Order in September 2019, Defendants retaliated against her by refusing to cash her rent checks from October 2019 to May 2020 and then using this past due rent (which they refused to accept) as an excuse to evict her. Dkt. No. 67-1 at 5. If true, Defendants' decision to cease accepting Plaintiff's rent checks the very

25

month after she filed the September 2019 lawsuit in order to later evict Plaintiff may be construed as "interfere[nce]" with Plaintiff in the parlance of the FHA or as a materially adverse action of Defendants, as required for a retaliation claim under the Rehabilitation Act.

Under the elements as outlined by the Tenth Circuit in *Hatfield*, all that remains to be determined as to Plaintiff's FHA retaliation claim is whether the Defendants interfered with the Plaintiff on account of her protected activity under the FHA, and whether the Defendants were motivated by an intent to discriminate. *Hatfield*, 2023 U.S. App. LEXIS 10527, *14. Regarding Plaintiff's Rehabilitation Act retaliation claim, Plaintiff must make a *prima facie* showing that Defendants' adverse action was causally connected to Plaintiff's filing of the September 2019 lawsuit. *Reinhardt*, 595 F.3d at 1131.

It is at this stage – of demonstrating evidence of wrongful motive or intent – that indirect evidence is often brought forth, thereby invoking the *McDonnell Douglas* burden shifting framework. Neither Plaintiff nor Defendants directly address their burdens under the *McDonnell Douglas* framework, but Plaintiff's argument does point to the temporal proximity between the protected activity and the challenged action as circumstantial evidence of discrimination / retaliatory motive.

The evidentiary record is quite unclear regarding Plaintiff's factual contentions regarding this theory of retaliation. Plaintiff's Complaint alleges that Defendants ceased accepting Plaintiff's rent checks "through May 2020" but does not state when or why this began. Dkt. No. 2 at 10. Plaintiff's Response to Defendant's Motion for Summary Judgment argues that Defendants ceased accepting Plaintiff's rent checks in October 2019 and includes exhibits purporting to show Plaintiff delivering rent checks to Defendants for the months of February, March, April, May, and July of 2020. Dkt. No. 67-1 at 39 to 46.

In response, Defendants explain that Plaintiff's rent checks from October 2019 to May 2020 were not cashed because Plaintiff's Second Lease Agreement had been terminated effective September 19, 2019 and Plaintiff had not completed the recertification process and signed a new residential lease agreement.  Dkt. No. 84 at 5.  Defendant points to the Notice to Terminate Residential Apartment Lease Agreement ("Notice") included as an exhibit to the Motion for Summary Judgment.  *Id*. (citing to Dkt. No. 55 at Exh. 4P).  The Notice is dated August 20, 2019— well before Plaintiff filed for temporary restraining order—and lists a termination date of September 19, 2019.  Dkt. No. 55 at Exh. 4P.  Defendants explain that the decision not the cash these rents checks was not due to animus or retaliation, but rather was to preserve any rights Defendants had under the Second Lease Agreement to evict Plaintiff or obtain some other relief.  *Id*.  In rebuttal to this assertion, Plaintiff simply disputes that the Second Lease Agreement terminated on September 19, 2019.  Dkt. No. 85 at 2.

Plaintiff's exhibits include a letter from Defendant WPM, dated July 6, 2020, which reads:

> I have enclosed your check back to you. Unfortunately, we are unable to take a check for a form of payment. You stopped payment on last month's check and previous month's before that. Section 9 of your lease "Return Checks" states, once Lessor has received one returned check you must thereafter pay monthly rent and other charges in the form of cashier's checks or money orders.

Dkt. No. 67-1 at 40.  But this correspondence was subsequent to Defendant WPM's eviction suit against Plaintiff, which was filed on March 13, 2020.

Defendants also argue that there was insufficient temporal proximity between Plaintiff's lawsuit and the Defendants' attempting to evict Plaintiff, which occurred six months after the September 2019 lawsuit.  Dkt. No. 72 at 8.  But this argument does not directly address Plaintiff's actual claim, which is that Defendants *immediately* stopped accepting her rent checks and then

moved to sue her because of the accrued rent six months later.  Dkt. No. 67 at 26-27; Dkt. No. 67-1 at 5.

Temporal proximity may be sufficient to establish a *prima facie* case of discrimination and retaliatory motive, but, as the Supreme Court has written, "the temporal proximity must be 'very close'" between the challenged action and the protected activity.  *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (quoting *Neal v. Ferguson Const. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001)).  In this Court's view, the temporal proximity of the actions under review is indeed "very close," and is sufficiently close for Plaintiff to have satisfied her burden of putting forth a *prima facie* showing of causation between the two events.

Under the *McDonnell Douglas* framework, it falls to Defendants to "articulate a legitimate, non-discriminatory reason for [their] actions" after Plaintiff has put forth a *prima facie* case. *Walkingstick Dixon v. Oklahoma ex rel. Reg'l Univ. Sys. Of the OK Bd. Of Regents*, 125 F.4th 1321, 1331 (10th Cir. 2025) (citing *Throupe v. Univ. of Denver*, 988 F.3d 1243, 1251 (10th Cir. 2021)). Defendants have pointed to a nondiscriminatory reason for ceasing to accept Plaintiff's rent checks from October 2019 to May 2020:  the termination of the Second Lease Agreement on September 19, 2019 and Defendants' desire to preserve any rights under the Second Lease Agreement to evict Plaintiff.  Plaintiff disputes that the Second Lease Agreement terminated, but does not point to anything in the factual record to support this.

Under the *McDonnell Douglas* framework, when a defendant provides a legitimate, nondiscriminatory reason for its actions, the initial presumption of discrimination is eliminated and the burden shifts back to the plaintiff to prove that the reason is a pretext for unlawful discrimination. *Walkingstick Dixon*, 125 F.4th at 1331.  In other words, the plaintiff must show that the defendant's stated reason is not the real reason for the defendant's actions and that

discrimination was the true motive.  Summary judgment will be granted if the plaintiff cannot prove the defendant's articulated reasons are pretextual.  *Throupe*, 988 F.3d 1243, 1251 (10th Cir. 2021).  Because Defendants provided a legitimate, nondiscriminatory reason for their actions, Plaintiff must now prove that Defendants' articulated reason is pretextual.  Plaintiff has failed to do so and, therefore, summary judgment is appropriate.

> **B.    Plaintiff's other retaliation claims fail.**

Plaintiff's other retaliation theories do not hold up either.  Plaintiff asserts that Defendants retaliated against her on account of her September 2019 lawsuit by: withholding recertification for 2020 and 2021 until December 31, 2020 and forcing Plaintiff to do all of the recertification documents in one day; suing Plaintiff for $949 in rent in September 2021; and attempting to terminate Plaintiff's tenancy due to her failure to pay her water bills which Plaintiff claims she did not owe.  These claims are readily disposed of.  Plaintiff's Response to Defendants' Motion for Summary Judgment at no point cites to any record evidence to support any of these theories.  Further, even if Plaintiff's claims were supported by evidentiary citations, none of these supposed retaliatory actions is sufficiently proximate in time to Plaintiff's September 2019 lawsuit to establish a *prima facie* case of retaliation based on temporal proximity alone, and Plaintiff has cited to no other record evidence showing any causal connection between her September 2019 lawsuit and these complained of actions.

Plaintiff further argues that she exercised her rights under the FHA by "contact[ing] the police after Defendants' property manager threatened to contact her abuser" and Defendant, in retaliation, issued a lease violation.  Dkt. No. 67 at 26.  But, as this Court has already held, Plaintiff's claim that Defendants' agent threatened to contact Plaintiff's ex-husband does not implicate any right protected by the FHA.  *Supra* § II(B).  By its terms, 42 U.S.C. § 3617 prohibits

retaliation on account of "the exercise or enjoyment of…any right granted or protected by" the FHA; given that Plaintiff's actions did not implicate any such right, she cannot avail herself of § 3617's protections.

**V.      Defendants are entitled to summary judgment as to Plaintiff's state law housing discrimination claims.**

Plaintiff has also alleged violations of the Oklahoma Discrimination in Housing Act, 25 Okla. Stat. §§1452 et seq., ("ODHA") and the Oklahoma Anti-Discrimination Act, 25 Okla. Stat. §§ 1601 et seq. ("OADA"). Dkt. No. 2 at 17-18. These state law discrimination claims are based upon the same facts as Plaintiff's federal law discrimination claims. *Id*. Both parties agree that the analysis of Plaintiff's claims under the ODHA and OADA is the same as the analysis of Plaintiff's federal claims under the FHA. Dkt. No. 55 at 25; Dkt. No. 67 at 20; see also W*atson v. Vici Cmty. Dev. Corp.*, No. CIV-20-1011-F, 2022 WL 910155, at *8 (W.D. Okla. Mar. 28, 2022).

In accordance with the Court's holdings above, Defendants are entitled to summary judgment on Plaintiff's sex discrimination claims and Plaintiff's disability discrimination claims, as well as on Plaintiff's claim that Defendants retaliated against Plaintiff because Plaintiff filed the September 2019 lawsuit against Defendants by refusing to accept her rent checks and attempting to evict her.

**VI.     Defendants are entitled to summary judgment on Plaintiff's cause of action for breach of contract.**

Plaintiff has alleged that Defendants breached the lease contract between the parties; the Court notes that Plaintiff's Complaint does not specify which provisions of the lease were breached or how Defendants have breached the lease. Dkt. No. 2 at 19.

A breach of contract claim consists of three elements under Oklahoma law: "(1) the formation of a contract, (2) breach of the contract, and (3) damages as a result of that breach."

*Cates v. Integris Health, Inc.*, 412 P.3d 98, 103 (Okla. 2018).  Defendants argue that they are entitled to summary judgment because Plaintiff has never identified any action of Defendants that would constitute a breach of contract.  Dkt. No. 55 at 27.

Plaintiff's response to Defendants' Motion for Summary Judgment simply restates the factual allegations that appear in her Complaint and largely fails to identify any particular provision of the lease that Defendants' conduct has breached  Dkt. No. 67 at 30.  Plaintiff's response does vaguely references alleged contractual provisions that were breached, but nowhere does Plaintiff actually cite to any particular lease or any particular provision of the various leases signed by the parties.  *Id*.  This is simply not good enough.  It is not the Court's duty to comb through the record in search of support for Plaintiff's arguments. *See Doe v. Univ. of Denver*, 952 F.3d 1182, 1191 (10th Cir. 2020).

The Court disregards Plaintiff's arguments that are unsupported by record citations, and, as none of Plaintiff's arguments opposing summary judgment properly cite to the record or specifically identify any provision of the lease and how it has been breached, Defendants are entitled to summary judgment on Plaintiff's breach of contract claim.

**VII.    Defendants are entitled to summary judgment on Plaintiff's malicious prosecution claim.**

Plaintiff has also brought a malicious prosecution action against Defendants, based upon the two eviction suits that were filed against Plaintiff.  Dkt. No. 2 at 20.

Under Oklahoma law, there are five elements to a malicious prosecution claim: "(1) the bringing of the original action by the defendant; (2) its successful termination in plaintiff's favor; (3) want of probable cause to join the plaintiff; (4) malice, and (5) damages." *Thacker v. Walton*, 499 P.3d 1255, 1260 (Okla. Civ. App. 2021) (citing *Young v. First State Bank, Watonga*, 628 P.2d 707, 709 (Okla. 1981); *Towne v. Martin*, 166 P.2d 98 (Okla. 1946)).

31

Defendants' Motion for Summary Judgment argues that Plaintiff has not satisfied the "multi-componential predicate" discussed by the Oklahoma Supreme Court in *Greenberg v. Wolfberg*, 890 P.2d 895, 901-902 (Okla. 1994). Dkt. No. 55 at 28-29. This argument is in error.[4] The "multi-componential predicate" is only a particular form of the malicious prosecution claim that does not apply to the facts as alleged by Plaintiff.

In opposing summary judgment, the Plaintiff argues that Defendants filed the March 2020 lawsuit without probable cause because Plaintiff did pay her rent from October 2019 to March 2020, but Defendants refused to accept her rent payments. Dkt. No. 67 at 31-32. Plaintiff also argues that the September 2021 lawsuit to recover unpaid water bills was filed without probable cause because Plaintiff was not obligated to pay for water under the 2021 lease. *Id*. at 32.

This Court first addresses the March 2020 lawsuit. Defendants admit that the first two elements of the malicious prosecution claim are met; Defendants brought an action against Plaintiff and it was terminated in Plaintiff's favor. Dkt. No. 55 at 14.

Defendants assert that they had probable cause to file the March 2020 suit for delinquent rent. Dkt. No. 72 at 10. Plaintiff must demonstrate a genuine dispute of material fact as to whether Defendants lacked probable cause in instituting the March 2020 lawsuit. The Oklahoma Supreme Court has written that, "[o]ne who initiates civil proceedings against another has probable cause for so doing if he reasonably believes in the existence of facts upon which his claim is based, and that under such facts the claim may be valid at common law or under an existing statute." *Lewis v. Crystal Gas Co.*, 532 P.2d 431, 433 (Okla. 1975). Plaintiff has not met this burden. Plaintiff argues that Defendants ceased accepting Plaintiff's rent checks in October 2019 in retaliation for

---

[4] While Plaintiff's Complaint does refer to the "multi-componential predicate" element of the tort as defined in *Greenburg*, it is ultimately the facts that Plaintiff alleges in her Complaint, not her erroneous citations of the law, that matter.

Plaintiff's September 2019 lawsuit, only to later file the March 2020 lawsuit alleging that Plaintiff had not paid this same rent that Defendants had refused to accept.  However, Defendants have provided a legitimate reason for not cashing Plaintiff's rent checks from October 2019 to May 2020:  the termination of the Second Lease Agreement on September 19, 2019.  While Plaintiff "disputes" that the Second Lease Agreement was terminated, the factual record—specifically the Notice to Terminate Residential Apartment Lease Agreement dated August 19, 2019, well before Plaintiff's temporary restraining order filing–indicates otherwise.  For these reasons, the Court finds that Defendants are entitled to summary judgment on Plaintiff's malicious prosecution claim founded upon Defendants' March 2020 lawsuit.

Defendants are also entitled to summary judgment on Plaintiff's malicious prosecution claim founded upon Defendants' September 2021 lawsuit.  Defendants' Motion for Summary Judgment sufficiently demonstrates that Defendants had probable cause for bringing the September 2021 suit; Plaintiff's argument against summary judgment demonstrates, at most, a disagreement regarding the interpretation of Plaintiff's lease, but this does not demonstrate that Defendants filed the September 2021 suit without probable cause to do so.

**VIII.   Defendants are entitled to summary judgment on Plaintiff's fraud claim.**

Plaintiff has alleged a claim of common law fraud, both actual and constructive, against Defendants; Plaintiff grounds her fraud claims upon an "Apartments.com" advertisement purportedly for Defendant Walnut Park Manor.  Dkt. No. 67-1 at 10.  Plaintiff claims that Defendants committed fraud by representing that "water, trash removal, and sewer" would be paid by the landlord  *Id*.

Actual fraud is defined in Title 15, §58 of Oklahoma Statutes as:

1. The suggestion, as a fact, of that which is not true, by one who does not believe it to be true.

2. The positive assertion in a manner not warranted by the information of the person making it, of that which is not true, though he believe it to be true.
3. The suppression of that which is true, by one having knowledge or belief of the fact.
4. A promise made without any intention of performing it; or,
5. Any other act fitted to deceive.

Actual fraud "represents the intentional misrepresentation or concealment of a material fact which substantially affects another person. *Sutton v. David Stanley Chevrolet, Inc.*, 475 P.3d 847, 852-853 (Okla. 2020) (citing *Patel v. OMH Medical Center, Inc.* 987 P.2d 1185 (Okla. 1999)). Actual fraud requires an "intentional deception." *Id.* at 853.

Constructive fraud, as defined by Title 15, § 59 of Oklahoma Statutes, consists:

1. In any breach of duty which, without an actually fraudulent intent, gains an advantage to the person in fault, or any one claiming under him, by misleading another to his prejudice, or to the prejudice of any one claiming under him; or,

2. In any such act or omission as the law specially declares to be fraudulent, without respect to actual fraud.

Unlike actual fraud, constructive fraud need involve no intent to deceive, and, in fact, "[e]ven an innocent misrepresentation may constitute constructive fraud where there is an underlying right to be correctly informed of the facts." *Faulkenberry v. Kansas City Southern Ry. Co.*, 602 P.2d 203, 206 n.6 (Okla. 1979).

The advertisement at issue, regarding which the Court has been provided no information beyond a single screenshot, is wholly insufficient to ground Plaintiff's fraud claims. Dkt. No. 67-1 at 10. Plaintiff has not tied this advertisement to Defendants – the advertisement could be for a completely different housing complex, as the screenshot contains nothing beyond the name of the complex tying it to Defendants; nor has Plaintiff established that Defendants were responsible for posting of the advertisement or were responsible for the allegedly fraudulent details in the advertisement. The evidence of fraud put forth by Plaintiff is simply insufficient. Because Plaintiff's evidence of fraud is insufficient to connect Defendants to the complained of

34

advertisement, Defendants are entitled to summary judgment on any claim of actual or constructive fraud.

The Court further notes that the advertisement, even if its provenance were clear, is not actually "material" to the parties' contractual relationship. Plaintiff's argument rests upon her contention that she believed that her rent included charges for water, but the lease between the parties is not ambiguous as to the division of utility payments – it is clear that the lessor would be responsible for "maintenance, snow removal, trash" only and that Plaintiff would be responsible for "all other utilities." Dkt. No. 55-2 at 6. Plaintiff was not misled or deceived because the actual, operative contractual language was clear; any misimpression caused by the advertisement should have been clarified by the lease to any reasonable contracting party. Indeed, Plaintiff was apparently not confused about her obligation to pay her water bills when she signed her 2017 lease, as the record demonstrates that Plaintiff consistently paid her water bill upon moving into WPM. Dkt. No. 72-7.

## IX.   Defendants are entitled to summary judgment on Plaintiff's Oklahoma Consumer Protection Act Claims.

Plaintiff's Complaint alleges that Defendants have violated the Oklahoma Consumer Protection Act, 15 Okla. Stats. §751 et seq. ("OCPA"), by filing frivolous collection actions against Plaintiff and by falsely advertising the apartment unit as including water in the rent payments. Dkt. No. 2 at 24-25; Dkt. No. 67 at 27.

Defendants argue that the OCPA is inapplicable to this dispute on two grounds. Dkt. No. 55 at 30-31. First, Defendants note that the OCPA does not apply to "[a]ctions or transactions regulated under laws administered by the Corporation Commission or any other regulatory body or officer acting under statutory authority of this state or the United States." Okla. Stats. Tit. 15 § 754(2). This exemption applies, Defendants contend, because the Oklahoma Landlord Tenant Act

covers the subject of the dispute.  But the statutory exemption cited applies when an action is regulated by "the Corporation Commission or *any other regulatory body or officer*" – Defendants do not cite to any regulatory body or officer responsible for resolving landlord tenant disputes or administering the Oklahoma Landlord Tenant Act.  The exemption is clearly intended to preempt OCPA lawsuits when a matter can properly be resolved by a state or federal agency – that is not the case here.  Defendants cite to Ohio case law holding that the Ohio Consumer Protection Act was preempted by the more narrowly applicable Ohio Landlord Tenant Act; this case law has no relevance to the Oklahoma statutory exemption cited.  Dkt. No. 67 at 30.

Defendants argue more successfully that the definition of "consumer transaction" within the OCPA does not include apartment leases.  Dkt. No. 67 at 30-31.  The OCPA defines a "consumer transaction" as: "the advertising, offering for sale or purchase, sale, purchase, or distribution of any services or any property, tangible or intangible, real, personal, or mixed, or any other article, commodity, or thing of value wherever located, for purposes that are personal, household, or business oriented."  15 Okla. Stats. § 752 (2). If this were the only language at issue, the Court would not be convinced that the OCPA was inapplicable, as the definition is quite broad. However, read this section in conjunction with 15 Okla. Stats. § 753 (Unlawful Practices), it is clear to the Court that the OCPA does not apply to the transaction at issue.  Throughout a lengthy, particularized list of practices that the act prohibits, § 753 wholly fails to reference rental or leasing transactions of any kind.  As such, this Court holds that the OCPA does not regulate apartment rentals, such as is at issue in Plaintiff's claims. Further, Plaintiff has pointed to no instance of Defendants committing any "unlawful practice" prohibited by the OCPA as set forth in § 753. Defendants are entitled to summary judgment on Plaintiff's OCPA claims.

## <u>CONCLUSION</u>

As set forth above, Defendants have demonstrated entitlement to summary judgment as to all of Plaintiff's claims.

IT IS THEREFORE ORDERED that Defendant's Motion for Summary Judgment [Dkt. No. 55] is GRANTED.

Dated this 28th day of October 2025

_____
JOHN F. HEIL, III
UNITED STATES DISTRICT JUDGE